Mr. Cagle, I presume that's you. Yes, sir. That is Jim Cagle, Your Honor. Well, whenever you're ready, you can start. I think we're all ready. Thank you very much. May it please the Court, my name is James Cagle. I represent Michael White in this appeal, of course. I appreciate your doing it this way. It's saving a lot of people a lot of money. I appreciate your doing it too. I will not, and if I talk over you, I apologize in advance, because I understand there's a delay. I will do my best not to do so. And I won't start with the argument that says I'm wearing no pants. But in any event, Your Honor, the primary and principal issue in this case is that the issue of the element known as the interstate commerce element, it affects each of the three counts that Mr. White stands convicted of. And it also found its way into the instructions of this case, which we contend are also defective as they relate to interstate commerce. The sort of overarching issue that we address both in our brief and I hope to today has to do with what I refer to as the temporal element, as described or defined in the Jones decision, which we rely on for purposes of this appeal and which we relied on consistently in the trial of this case. We believe that Jones has indeed a temporal element as it defines used in interstate commerce and that it refers to present tense, and that the court in Jones was quite specific in saying that the matter of past, passing, or passive use will not prove the element of interstate commerce. I acknowledge that the Jones case refers to the use of a or a burning of a private residence, and that has been used to try to distinguish the arguments which we're making here today from Jones. But I submit to the court that the emphasis in Jones and the emphasis that must be given the language of 844I has to do with used in. And certainly Jones says, look at the function of the premises which is burned and how that premises affects interstate commerce at the time of the burning. In this case, the place was vacant and there was no intent, and this is important, no intent on the part and no evidence of the same to ever rent that premises again. There was no commerce going on at all under any sense of that word as defined in Jones, and as a consequence we say that not only is Mr. White not properly convicted, but that affixes to each of the three counts, as you will note that the third count of which Mr. White was convicted has to do with the violation of 18 U.S.C. Section 3, accessory after the fact, which requires that in order to be guilty of that particular section of our code, that has to be within the federal jurisdiction. It was not for the same reason that Count 1 or Count 2, as it charged arson, is not within the ambit of Section 844I. Now, as to the instruction, and you will find that on Joint Appendix 111, and I will quote it, I believe, accurately on pages 9 and 10 of my brief, that indicates the defect in the court's... Mr. Cagle, can you hear me? I can, yes, sir. Is it clear that this property was not occupied at the time that this fire was being planned? It is clear, Your Honor. There was no testimony, and could be none, in the record that indicated that it was occupied. There is, I agree, there were some articles of personal property that appeared to have been left behind that are shown in the record as having burned, but there was no occupancy. And I'll get to that also, Your Honor, when I address the matter... Left behind or stored? Left behind or stored there? I believe the testimony were that there were personal belongings that were being actually stored in the property, correct? I don't agree with that, Your Honor. The testimony was that the person left and that she left behind articles. That is actually the person who had been out literally for months from that premises. Well, I'll draw your attention to 263 of the appendix. Question, do you ever go back to the apartment during this time and spend the night there? I went one time, but periodically I'd go by and check on it and see if, you know, our stuff was still there, our clothes and stuff. Is that an indication of abandonment to you? Yes, it is an indication, and it was abandoned. And let me point this out, Your Honor. If that were stored, and I made this argument in the sentencing. If, in fact, it was stored, then it was stored for no commercial purpose. Ergo, it was not in interstate commerce at the time. And simply leaving, when you abandon an apartment, leaving behind personal property would not make it in interstate commerce. So that, in fact, even if one interprets that as somehow a person who's left the premises wants to store for no commercial purposes articles which she chooses to leave behind, it certainly does not constitute interstate commerce, which is really the point of the whole jurisdictional nexus. Wouldn't Mr. White seek rental monies for the period of time that her personal belongings were kept on the premises? At that point, he could not, Your Honor. They had been evicted under court order. So he would have no right to seek anything. There was one that wasn't evicted, correct? No, sir. They reached the subject of an eviction. Mr. Cagle, you say that there was no intent to bring this property back as commercial property. Are you saying that because there was an intent to burn it? Well, you know, I have to say this in all fairness and candor with this Court. If one assumes, and as we must, that Ms. Kinder's version of the facts is the accurate version, we have to assume that for purposes of this appeal, then the agreement was that it would be torched after all tenants were out. My point with that is accepting that for purposes of this appeal, and I acknowledge I think we have to, accepting that fact, then that would be a conspiracy under the state law of the state of West Virginia, not a federal conspiracy. If the object is to burn a vacant building taken out of interstate commerce, then the intent was one that's cognizable under state law, not federal law. And I understand it's hard for courts, and I'm sure it would be hard for a jury to adopt that, but I submit to this Court that is the law. That there is a reach that the federal government has, and there is an end to that reach. And this case is when it's out of interstate commerce. Let me ask you, that seems to present an interesting argument in light of the fact that you had a commercial insurance policy on it. If he intended to burn it and no longer ever occupy it, how is it that he kept the commercial insurance going on it? It would seem consistent with actions that you're going to no longer ever have it for commercial property, you're not going to have it that you would terminate that at the very least. But not only did he maintain it, he went on later on to collect it. It looks like to me he really wanted this to be commercial property. Well, Your Honor, he didn't cancel the insurance. It was still within the insured period. But I will point out to this Court that in Jones, the presence of insurance was deemed not sufficient to put it in interstate commerce, just like utilities. That is the teaching of Jones, and that's the teaching I rely on on behalf of Mr. White in this case. But I thought you cited Jones for the temporal aspect of it, the past incident being in the past, and yet Jones, as you pointed out, dealt with an owner-type situation where the owner was actually occupying it. This is a rental property, and there are cases, I take it you can acknowledge from this circuit and other circuits, that deal pretty direct with the issue at hand here, and that is that if you have property that's no longer being occupied, and yet at the same time there are indications that it could be occupied again for rental purposes, that it falls within the ambit of this statute. I mean, there are cases that seem to be, Fifth Circuit seems to have a case pretty much on point here. How do we deal with those? I think you deal with those by strictly following Jones. The case that the court, the district court relied on, as did the government, was an unpublished case, which I submit would be non-binding on. But, yeah, I acknowledge that other courts have said that. I simply disagree with that and urge this court to follow the teaching of Jones to the letter of Jones. With regard to, and I want to make sure I touch this because I'm drawing down my time, the third count of the indictment was accessory after the fact. I want to emphasize, and I think I cannot overemphasize, that there was one witness to testify, Mr. Thompson. He worked for Nationwide. He was not interviewing Mr. White for the fire in question in this litigation. It was a one-question interview as it would relate to this. Have you had other fires? What do you think happened or something to that effect? Mr. Thompson testified at trial. There is nothing in that response, there is nothing in all of the evidence presented, that would meet the test of the requisite intent to hinder the prosecution in any way of Kim Kinder, who became a government witness in this case, so that I submit that on the record, Mr. White is entitled to a verdict of not guilty and that the court erred in failing to do so, that there was an absolute vacuum of evidence which would support the criminal intent required. Moreover, as I pointed out earlier, count three would require that the evidence supported the arson under the federal statute to begin with, so that there are two deficiencies as they relate to count three. And I'd like to turn to the issue which elevated Mr. White's sentence for as much as 30 months. It is the 2K1.4, which has to do with the base level of the offense. In this case, the court put the base level of the offense at 24 as opposed to 20, finding that the property burned was a dwelling. There is no definition within that particular guideline as to dwelling. There are differing opinions about dwelling from the circuit, including the Fifth Circuit. And I submit that the ordinary reading, the ordinary meaning of dwelling ought to be applied, and I will point out a decision which I found from the U.S. Supreme Court which defined dwelling, and I acknowledge it was in another context, but it is Federal Housing Administration v. Darlington, Inc., and it's 358 U.S. 84. It's 1958 was the date of that decision. It says dwelling in common parlance means a permanent residence. The idea of permanency pervades the concept of a dwelling. If one uses the ordinary definition of dwelling taken from the dictionary, taken from Black's Law Dictionary, you cannot come to the conclusion that the district court came to in this case and that I think Mr. White is entitled to the benefit of that definition insofar as it is not otherwise defined within the guideline itself. Finally, Your Honor, I did raise an issue in my opening brief as to the two-level obstruction enhancement. I urge this Court to take another look at the Dunnegan decision which this Court agreed with my position on previously but was reversed by the U.S. Supreme Court, and I ask you to take a look at that issue in light of the cases I cite, Booker, Fan Fan, and of course Blakely. I believe that when a judge without benefit of a jury finding determines that someone has testified falsely, that is committed perjury at his trial, I think you're denying to that person the benefit of the Sixth Amendment right. And as a consequence, in view of Booker and its progeny, I ask the Court to take a look at that issue as it would relate to the two-level enhancement for obstruction which was argued in the sentencing of Mr. White. I appreciate this Court's attention, and I appreciate the way that this matter has been set up, and I thank you. If there are no other questions, I am completed. Okay. Thank you, Mr. Cagle. You're welcome. Mr. Ellis, we'll be glad to hear from you whenever you're ready. Thank you, Your Honor. I am ready. May it please the Court. I also join with Mr. Cagle in thanking the Court for allowing us to conduct these proceedings in this manner and likewise hope that I don't get things out of order here and step on someone. I'll try my best not to. I would like to begin by answering some of the questions that were posed by the panel during Mr. Cagle's argument. I have different answers for those questions, of course. I believe the first question that Judge Wynn asked, if I'm correct, was, does the record show at the time the fire was planned there was occupancy? And I believe Mr. Cagle said there was none. And actually, I would contend that the record clearly establishes that at the time the fire was planned there was occupancy. Now, the woman who left the apartment, her daughter died there and she just became itinerant after that, Ms. Ketcherside, was not sleeping there regularly at the time. But the other tenant was. At the time the scheme was hatched, which was in mid-September if we go by the record, at the time the scheme was hatched, Ms. Shannon Dickens Kitty, the other tenant, was living there. Her testimony is, and this is uncontradicted, her testimony is that she left the apartment sometime after the eviction proceeding. The eviction proceeding was actually served on her on September 11th. I believe the hearing in the magistrate court in Boone County, excuse me, was on the 21st. And the eviction order by its terms was not effective until October the 15th at midnight, only some few hours before the fire was actually set. But Ms. Dickens Kitty at trial testified that she did not leave the apartment until sometime in late September or early October. So the record, it is at the very least a fair inference from this record that at the time this scheme was planned, these apartments were, in fact, occupied. Mr. Ellis. Yes, sir. My recollection is that Ms. Kinder testified that she and her husband drove by the apartment twice with the intent to burn it, and somebody was living there then, and that's why they kept going and didn't stop. Is my recollection correct? Yes, that's right. That's treated in a footnote in my brief, and I believe that can be explained in this way. Mr. White, the final hearing on the eviction was on the 21st, but she still had time to get out. And so he, Mr. White, may have said to the Kinders, I've already finished the eviction proceedings, which he had. But Ms. Dickens Kitty remained in the apartment for some time. So it's quite logical and very plausible that the eviction proceedings were over. The order hadn't taken effect yet, but the proceeding was actually over, and she was still in the apartment. In fact, that's the best way to read the record. That's the most logical way to read this record. So the court is right. The Kinders made two forays to the apartments in Vann, found someone there, and made a decision not to do it. So the answer, finally, Your Honor, is yes. The second question that the panel raised during Mr. Cagle's argument was, I believe, this question. Did the defendant seek rental money from the tenant for the time that she kept her belongings there? And Mr. Cagle answered that no, he didn't. And I don't believe the record supports that. If you look at the eviction papers, which, in fact, were never served on Ms. Ketcher's side, the eviction papers themselves, the petition that was filed, asks for back rental. Now, it doesn't enumerate the months, and we have a $5,000 limit that the magistrate can award, but there's no way to say that that was not for the period of time that she had left her things there and was itinerant with her friends while she was recovering from her daughter's death. So I believe the record supports an inference or the idea that, in fact, this defendant did seek money from Ketcher's side for the period of time that she kept her belongings there. Another exchange between Mr. Cagle and the panel had to do with were both of these tenants evicted? And I believe that Mr. Cagle's answer was both were the subject of an eviction. And depending on what we mean by subject, that's true. But the legal reality of it is that Ms. Ketcher's side was not evicted. In fact, Mr. White, though he filed the suit, never got service on her. If you read her testimony, she didn't even know about an eviction proceeding. She kept coming to the apartment to check on her things. In fact, she found out about the fire by coming there one day to check on and get some clothes. She was never evicted. Because she was never legally evicted, she had a legal right of ingress and egress to the apartment, which she still used and which she still exercised. So it is the position of the government that at least one of the tenants had not been evicted, even if we measure things from the time of the fire. Mr. Cagle also suggested that the fact that Ms. Ketcher's side kept her furniture and other belongings there would not suffice as evidence on the interstate commerce element because her belongings were not stored there for a commercial purpose. Well, that's not the question. When tenants stay in an apartment, they don't have to stay there for a commercial purpose to make it a commercial building. By the same token, if we are to consider Ms. Ketcher's side as someone who had a legal right to enter the property and used it to store her personal belongings, then it does not matter whether those personal belongings were actually used for a commercial purpose or not. Your Honor, let me ask you this question, Mr. Ellis. Do you have any evidence that the defendant in this case, Mr. White, intended to replace those two tenants with other tenants? No, no. Our evidence is clearly that he intended to burn it down. That's what he intended to do. So is your case dependent on the tendencies of those two people continuing up until the time or existing during the time the conspiracy was formed? Your Honor, I believe that the record meets that test. I believe we meet the test because of the evidence of the occupancy and continuing use of the building even at the time the match was struck. So your theory of the case is not dependent on there being a future tenancy? No, Your Honor. No. And we believe the record establishes that the intent was to destroy these buildings. So it's not dependent on there being a belief by the jury that this building would continue to be used as an apartment building? No, it's not. Now, the other thing that I think is at issue here is a matter that is dealt with by this court in both Milligan and Parsons, and that is the issue of whether someone who is possessed of a building that's clearly involved in interstate commerce under the case law or under the legal definitions that we have here, whether a person who has a building like that and then plans to burn it down through that plan removes the building from the reach of the statute. And I think that this court's opinions in both Parsons and Milligan say that the answer to that is no, that it is fair to look at what the character of the building was, what the function of the building was at the time the scheme was hatched. Well, let me ask you a follow-up on the Chief's question on the intent insofar as whether it was intended to have tenants again or intended to burn it. What is our focus here? If it's intended to burn, and we're looking at that, it would seem to me an owner of a building could make that determination at any time and take it out of interstate commerce by saying from now on I don't intend to have this as commercial property because I intend to burn it. And yet it seems like the act here is a criminal act. And the question is can the intent to commit a criminal act be sufficient to remove something from interstate commerce where it would be it probably can be assumed that if the criminal act did not occur, the building would probably be continued to use as commercial property. Your Honor, that's exactly our point. If you would read it the way Mr. Cagle urges, it's almost a catch-22 situation. It's almost, okay, I have a building that's involved in interstate commerce. I'll burn it down. That'll take it out of interstate commerce. I don't intend to use it in interstate commerce in the future. Therefore, the feds can't come after me. That's what we believe is absurd and ridiculous and would in essence defeat the statute. We have no case that embraces that kind of logic where the statute is concerned. And we believe and urge the court that both Milligan and Parsons view it the other way. That is that it is fair and in keeping with the statute to look at what this building was used for at the time the scheme was hatched. Well, it does pose a rather interesting argument. And I'm thinking in terms of some of the other cases out there that I don't think I've seen that where the intent to commit a criminal act that would destroy the property would be sufficient to defeat an interstate commerce claim for property that heretofore had been used as commercial property. And, in fact, is still being maintained with commercial insurance. And it would seem logical to me that if the act didn't occur, you would assume, well, there's no intent to do anything else with it but return back to commercial property. There was certainly no indication another way. And, Your Honor, I might point out on that same point that although we believe and it's our theory that it is fair and the district court was correct in instructing the jury that they could look to how the building was used at the time the plot was hatched, that the criminal enterprise was put in motion just as was done in Milligan. The other thing that's relevant on this point, it seems to me, is that count one is a continuing offense. Count one is a conspiracy that begins sometime in, I believe, September and maybe even earlier when Miss Kitty was still there, when Miss Ketcherside, her material was still there. In other words, the question on count one and count two might be a little different. We believe that the evidence is sufficient and that the legal theory is sufficient as established in Parsons and Milligan to justify and to affirm the convictions on all three counts, but count one is a little different. It's a continuing offense and it took place over, I believe, a several week and maybe more than a month period. Unless the court has other questions, I'm ready to rest on my brief. One question out of curiosity, and that is, it seems clear to me that even without the federal offense, there would be a state offense here. Yes, sir. Is it that the state penalty is so much less than the federal penalty or that the zealousness to prosecute this is less? It would seem it doesn't matter what court he goes to, he's going to be prosecuted and he's basically indicating he's guilty. He's just saying we don't have jurisdiction over it. I'm sorry, Your Honor. I don't mean the point of this is not whether or not he did it or not. The question deals with the character of the building and the jurisdiction. But still, it's curious to me that he's arguing that he shouldn't be in this forum, but he clearly would be in the other forum. And I'm trying to figure out how do you win like that if the courts are similar? Well, Your Honor, I am. I would love to answer the question. It's a fair question and I would love to engage. I'm not sure I can answer that question without going outside the record here. We're in West Virginia. We're a poor state. Our counties are poor counties. There is a lot of corruption and a lot of bad stuff going on in southern West Virginia. We do our best to get to it. Let's not go there. I'm satisfied you've answered my question. Okay. Thank you, Your Honor. Mr. Ellis, I have a question. Yes, sir. Have you ever watched the shows that talk about let's flip this house? Yes, sir, I have. My wife's crazy about them. If my wife gets to the remote before I do after dinner, that's what we watch. Right. So my question has to do with that type of theory. Let's suppose the owner of this building, this apartment building, says, I want these two tenants out and I'm going to flip this house. I'm going to convert it into a residence for my daughter who's getting married soon. So I want to get these tenants out. I'm going to convert this into a single-family dwelling. It's not going to be our apartment house anymore. I'm going to put my daughter in there. Then, doggone it, before all this gets done, the wedding's called off. Now he's stuck with this house. He's getting the tenants out. They're being evicted. And he tells the Kenders, look, after these tenants are out, I want you to burn this house down because I'm not going to be able to use it for the purpose I wanted to use it for. So once they're gone, I want you to burn the house down. Now, if those were the facts, would that affect the jurisdiction of the federal court? Yes, Your Honor. I believe that's a completely different kettle of fish. Tell me what makes that different. Well, because you have acts other than the plot to burn it down. You have acts that are other than the criminal scheme where he exercises and demonstrates an intent to remove this from interstate commerce. That's where you find the distinction between the cases. If, as in Gatos, and there's another case that this court cites in a footnote in Milligan, Gatos and another case, the situation was like Your Honor just put it to me, where there were other intervening things where someone said, you know, I'm going to change that building. I'm going to let my daughter live there. And, you know, I'm just making a decision right now. I'm not going to rent that thing out anymore. It's too much trouble. I think then our situation as prosecutors is totally different. But what we have in this case is that the only intent to do anything with that building was to destroy it through a criminal scheme. And that does not take him out of the federal statute under Milligan. The reason that question is a good question by the chief is he earlier asked you, did it matter as to whether he intended for the tenants to come back or that he intended for it to be used again? And in the scenario he gave, he pointed out quite clearly there was intent not to come back. And yet you answered it saying, well, that's a big difference because here you don't have that. You see where we're going with that? Well, Your Honor, again, I would submit that the distinction and this is a distinction that has been made already in cases decided on this very point. It is the distinction that this court makes in Milligan that distinguishes this case from Gatos. And that is, in this case, the only intent we have on the perpetrator's part is an intent to destroy the building through a criminal scheme. In Gatos and in other cases, I think one of which may have involved an old fitness center, you have other things like Judge Traxler threw into the equation for me just here, that, you know, outside of the criminal scheme, something other than this plan with the Kenders to burn it down, there is evidence, and maybe a good deal of evidence, that we're taking this out of interstate commerce anyway. It's out of it. We're not going to use it anymore. In our case, in Mr. White's case, the only intent is to destroy it criminally. There is no other intent. And we submit that under Milligan and Parsons, that does not remove it from federal jurisdiction. A plan to destroy a building involved in interstate commerce and thereby, through that plan to destroy it, to remove it from interstate commerce does not function to remove it from the ambit of the statute. And that, I believe, is the holding in Milligan and also Parsons. And to collect on a commercial real estate insurance policy. He did, yes. Yes. Your Honor, thank you. Okay. Thank you, Mr. Ellis. Mr. Cagle, you have a few minutes remaining. Thank you very much, Your Honor. In the three minutes I have left, I want to focus on the intent. Because as I heard the questions asked and the answers being provided by Mr. Ellis, I believe that the difference, if you want to shine a light on it, has to do with the intent. It seems to be the argument of the government that they wish to stretch federal jurisdiction, to stretch the element of interstate commerce by basically assumptions and, in cases, fictions. In the question proposed by Judge Trexler, I heard a question that was suggesting a scenario very close to Jones, in which there is a private residence, no commercial activity involved, no intent to have commercial activity involved. And that is the gist of the defendant's argument in this case. The testimony, and the only testimony, describes an intent to burn or a conspiracy to burn an empty building, which was out of interstate commerce. That is the case that was tried, and it is for that reason that Mr. White is entitled to have his conviction reversed. That is the precise case that was tried. Let me delve on that Jones case a little bit. You say that the evidence in that case showed there was no intent to convert that owner property into commercial property, and yet the issue here is whether there is evidence to show an intent to take commercial property to another type of property, which would be owner or something else outside of commercial property. And outside of the indication that he intended to burn it, is there any evidence of that? The evidence was that, well, there was no evidence by the government indicating an intent to re-rent or to offer it for sale. None. Let me make sure you understand my question so we get it. It's established that it's already being used as commercial property. And unless something shows that it's not being used as commercial property, I mean, it would seem that that establishment stands. My question is, is there any evidence other than the indication that he intends to burn it that it would not be used as commercial property, as some of the cases have indicated? Other than Mr. White's testimony. Mr. White's testimony was that he did not intend to return it to any sort of rental activity. That's the essence of the case when he evicted the two tenants. And we got that because he said he intended to burn it. He didn't say that. But, I mean, we can basically infer that. He was going to burn the house down, so it was pretty clear he didn't intend to rent it again. Well, that's right. So my point being that the intent was purely one of state law arson, which we do have a statute of that, and the penalties are severe, perhaps not so much as the government, in this case the federal government. Thank you. Before you leave, Mr. Tegel, let me just ask you a question. As Judge Wynn correctly pointed out, my questions concern this issue. Is it completely irrelevant what the future use of the property is going to be after it stops being used as an apartment building? And what would be your answer to that? My answer is it is not completely irrelevant, but my further answer is under the evidence and the record of this case, there is no suggestion even of any intent to put it back into any commercial endeavor, whether it be renting or selling that property. There's none whatsoever. Don't we have to view the testimony and evidence in the light most favorable to the government to answer that question? Or do you think that's somehow a question of law? I think in large parts it's a question of law, but I don't believe that the court will find anything in this record that would indicate any intent to return this property to some commercial endeavor. And the truth of the matter is it hadn't been a commercial endeavor for months. There was no economic activity associated with it. In his eviction action, didn't he seek back rent up until the time of eviction? Yes, sir, you would be entitled to it. But there is no commercial activity in the sense that he was expecting to be paid for the use of that apartment up until the time of eviction. Judge, in all due respect, I think litigation in which a person seeks damages is not contemplated as commercial activity. That's a legal activity, but it's not commercial activity within the meaning of the interstate commerce clause I would submit to this court. Any judges have any further questions? No. Thank you. Thank you, Mr. Cagle and Ms. Ellis. I appreciate also your agreeing to participate in this fashion. And we'll adjourn now, and then, judges, I'll be calling you shortly. Thank you. Thank you, sir. We're adjourned. Okay.
judges: William B. Traxler Jr., James A. Wynn Jr., George L. Russell III